**[Cite as *In re I.V.*, 2024-Ohio-2843.]**

COURT OF APPEALS
TUSCARAWAS COUNTY, OHIO
FIFTH APPELLATE DISTRICT

IN RE: I.V. AND X.D.M.

:    JUDGES:
:    Hon. William B. Hoffman, P.J.
:    Hon. John W. Wise, J.
:    Hon. Andrew J. King, J.
:
:
:
:    Case No. 2024 AP 02 0007
:
:    O P I N I O N

CHARACTER OF PROCEEDING:      Appeal from the Court of Common Pleas, Juvenile Division, Case No. 2021 VI 0185

JUDGMENT:      Affirmed

DATE OF JUDGMENT:      July 26, 2024

APPEARANCES:

For Plaintiff-Appellant

PAUL HERVEY
4700 Dressler Ave. NW
Canton, OH  44718

Guardian *Ad Litem*

NICHOLAS DOUGHTY
401 W. Tuscarawas Ave.
Suite 201
Canton, OH  44702

For Defendant-Appellees

SHARON BUCKLEY-MIRHAIDARI
152 N. Broadway, #200
New Philadelphia, OH  44663

*King, J.*

{¶ 1}   Appellant Tosha Clark appeals the February 15, 2024 judgment of the Court of Common Pleas of Tuscarawas County, Ohio, Juvenile Division, awarding legal custody of two children to appellee paternal Grandparents William and Deana Vonderheide. We affirm the trial court.

## FACTS AND PROCEDURAL HISTORY

{¶ 2}   This is the second time this matter has come before this court. This case involves the legal custody of two children, I.V. born in March 2017 and X.M. born in May 2020. Mother is Megan McGuire and Father is William "Dean" Vonderheide. Father died of a drug overdose before X.M. was born. At the time of his death, father was living with Grandparents at their Kentucky home. I.V. was present in the home the day he died.

{¶ 3}   In July 2020, the children were removed from mother's care due to her own substance abuse issues and placed with appellant Tosha Clark pursuant to a "safety plan." Clark was a friend of mother's and the fiancé of mother's half-brother Max. Clark and Max had two children together. Those children are first cousins to I.V. and X.M. Max is also deceased.

{¶ 4}   In August 2020, Tuscarawas County Job and Family Services filed a complaint alleging the children to be neglected and dependent. The agency was granted temporary custody of the children and they remained in Clark's care. When the children were initially placed with Clark, Clark's boyfriend Blake Lang was living with her. Lang moved out shortly thereafter.

{¶ 5}   In September, 2020, the children's paternal aunt and uncle, Samantha and Greg Beyer, filed a motion to intervene and a motion for temporary custody. Clark filed her own motion to intervene along with a motion for legal custody of the children.

{¶ 6}   On October 15, 2020, mother stipulated to a finding of neglect and dependency. By judgment entry nunc pro tunc filed October 27, 2020, the trial court granted both motions to intervene.

{¶ 7}   Hearings on the custody motions were held on April 6, and 13, 2021. The Beyers orally moved to amend their motion for temporary custody to one for legal custody. The trial court granted the motion. By judgment entry filed May 27, 2021, the trial court granted legal custody of the children to Clark, with visitation to the Beyers. The Beyers' visitation consisted of every other weekend during the school year, four weeks in the summer, and half the holidays. Grandparents enjoyed visitation through the Beyers.

{¶ 8}   The Beyers appealed that decision. We affirmed the trial court. *In re I.V.*, 2022-Ohio-118 (5th Dist.).

{¶ 9}   In October 2022, an agreement was entered into between Grandparents, the Beyers, and Clark regarding visitation. The agreed judgment entry outlining the visitation agreement was filed October 7, 2022. The agreement left the Beyers' visitation unchanged, but expanded Grandparent's visitation. According to the agreement, Grandparents would have two unmonitored and uninterrupted phone calls per week, visitation on designated weekends throughout the year, and two weeks during summer vacation.

{¶ 10} In late 2022 or early 2023, Clark rekindled her relationship with Lang and Lang moved back into Clark's home.

{¶ 11} In July 2023, Grandparents filed a motion for legal custody of the children. Grandparents also sought to have Clark held in contempt for allegedly violating the terms of the 2022 visitation agreement.

{¶ 12} Mother's whereabouts were unknown. She was ultimately served by publication and did not appear at any proceedings in this matter.

{¶ 13} The matter came to trial on December 19, 2023 and January 3, 5 and 8, 2024. On February 15, 2024, the trial court granted Grandparent's motion for legal custody. The trial court found a change in circumstances in that Lang was residing in Clark's home and was not a good influence on the children. It additionally found the change of legal custody was in the children's best interests.  Clark was granted visitation one weekend every other month and two weeks during the summer. Visitation for the Beyers remained the same. The trial court dismissed Grandparents contempt motion.

{¶ 14} Clark requested a stay pending appeal. The motion was denied.

{¶ 15} Clark timely filed an appeal and the matter is now before this court for consideration. She raises three assignments of error as follow:

I

{¶ 16} "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN FINDING A CHANGE IN CIRCUMSTANCES. "

II

{¶ 17} "THE TRIAL COURT ABUSED ITS DISCRETION IN FINDING THAT IT IS IN THE CHILDREN'S BEST INTERESTS TO BE REMOVED FROM APPELLANT'S CUSTODY AND THAT THE BENEFITS OF SUCH A CHANGE WERE OUTWEIGHED BY THE HARMS."

III

{¶ 18} "THE TRIAL COURT ABUSED ITS DISCRETION IN PROHIBITING ANY CONTACT BETWEEN THE CHILDREN AND APPELLANT'S BOYFRIEND."

I, II

{¶ 19} We elect to address Clark's first and second assignments of error together. In her first assignment of error, Clark argues the trial court abused its discretion in finding a change of circumstances, and in her second assignment of error she argues the trial court abused its discretion in finding it was in the children's best interests to be removed from her custody.

{¶ 20} Although not raised by either party, this matter involves a request for a change of legal custody between a non-parent and a non-parent. While the children were initially removed from mother's care pursuant to an allegation of dependency and neglect, no such complaint is involved in the current matter. When Clark was granted legal custody in 2021, the involvement of the Tuscarawas County Department of Job and Family Services was terminated. Judgment Entry, May 27, 2021 at 8-9.

{¶ 21} In *P.K. v. J.V.*, 2018-Ohio-5383 (5th Dist.), we addressed a similar circumstance in a legal custody dispute between maternal and paternal grandparents. We noted:

> In this case, no public or private child welfare agency filed a complaint alleging that Grandchild was a dependent, neglected, or abused child. Grandchild was never adjudicated dependent,

neglected, or abused. Paternal Grandparents initiated a complaint for custody and by agreed judgment entry, they were granted legal custody of Grandchild. The Ohio Revised Code does not specifically provide statutory guidance for modification of legal custody between a non-parent and a non-parent. As the kinship placement of children affected by the opioid epidemic continues to rise, the General Assembly may have to address this issue. At the present, we consider case law regarding the custodial modification between a biological parent and a non-parent holding legal custody of the child. We have held that in such circumstances, "[o]nce a juvenile court has exercised jurisdiction over a child, the court has continuing jurisdiction to determine what is in the best interests of the child. As a result, a change in circumstances is not a prerequisite to the resumption of the juvenile court's jurisdiction. * * * [T]he philosophy of requiring a change of circumstances in divorce custody issues is based upon the presumption that parents are equals and must be treated as such. In a juvenile proceeding where the parties are not on equal footing, the change of circumstances standard is not applicable." *In re E.Z.H.*, 5th Dist. 2013-Ohio-3494, 2013 WL 4055552, ¶ 18. A parent's interest in the care, custody, and control of his or her child is a fundamental liberty interest. *In re Hockstok*, 98 Ohio St.3d 238, 2002-Ohio-7208, 781 N.E.2d 971, ¶ 16. "However, where there is a custody dispute between two nonparents, no such

fundamental liberty interest exists." *In re J.R.P.*, 2018-Ohio-3938, 120 N.E.3d 83, ¶ 26 (7th Dist.). In this case, the trial court was not required to find a change of circumstances when considering the modification of legal custody between non-parents. The trial court must conduct a best interest analysis. *In re T.J.T.*, 7th Dist., 2017-Ohio-4279, 92 N.E.3d 272, ¶ 21.

{¶ 22} *Id.* ¶ 34. Given the posture of this matter, we find the same is true here. The trial court was not required to find a change of circumstances. It was, however, required to conduct a best interests analysis.

Best Interests

{¶ 23} The trial court may adjudicate claims for legal custody between non-parents by conducting a best interest analysis in accordance with the factors set forth in R.C. 3109.04(F)(1). That section provides:

(F)(1) In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to:

(a) The wishes of the child's parents regarding the child's care;

(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns

as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether

either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

(2) In determining whether shared parenting is in the best interest of the children, the court shall consider all relevant factors, including, but not limited to, the factors enumerated in division (F)(1) of this

section, the factors enumerated in section 3119.23 of the Revised Code, and all of the following factors:

(a) The ability of the parents to cooperate and make decisions jointly, with respect to the children;

(b) The ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent;

(c) Any history of, or potential for, child abuse, spouse abuse, other domestic violence, or parental kidnapping by either parent;

(d) The geographic proximity of the parents to each other, as the proximity relates to the practical considerations of shared parenting;

(e) The recommendation of the guardian ad litem of the child, if the child has a guardian ad litem.

(3) When allocating parental rights and responsibilities for the care of children, the court shall not give preference to a parent because of that parent's financial status or condition.

{¶ 24} Unlike a permanent custody proceeding where a juvenile court's standard of review is by clear and convincing evidence, the standard of review in legal custody proceedings is a preponderance of the evidence. *In re A.C.*, 2007-Ohio-3350 (12th Dist.) at ¶ 14. In this type of dispositional hearing, the focus is on the best interest of the child. *In re C.R.*, 2006-Ohio-1191; *In re P.S.*, 2012-Ohio-3431 (5th Dist.).

{¶ 25} We review the trial court's decision for an abuse of discretion. "Abuse of discretion" means an attitude that is unreasonable, arbitrary or unconscionable. *Huffman*

*v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87 (1985). Most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary. *AAAA Ent., Inc. v. River Place Community Urban Redev. Corp.*, 50 Ohio St.3d 157, 161 (1990). An unreasonable decision is one backed by no sound reasoning process which would support that decision. *Id.* "It is not enough that the reviewing court, were it deciding the issue de novo, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result." *Id.*

{¶ 26} During trial, the main focus for Grandparents in seeking a change of legal custody was Lang's presence in Clark's household. They also cited difficulty talking to their grandchildren twice a week and in receiving visitation as outlined in the visitation agreement.

{¶ 27} Nicolas Doughty, the guardian ad litem testified first and indicated he was initially appointed in August of 2020 during the dependency and neglect case and reappointed for both the grandparent visitation matter and the instant matter. He stated he initially had some concerns when Clark did not follow through with I.V.'s counseling at Phoenix Rising, but given I.V.'s challenges, he was not certain it was necessary for I.V. to continue counseling. Doughty did, however, agree that counseling was a part of I.V.'s individualized education plan (IEP). Transcript of Trial (T.) 9-11. Doughty stated he vaguely recalled that when the Tuscarawas County Department of Job and Family Services (TCJFS) placed the children with Clark, Lang was not to be living in the home. T. 14.

{¶ 28} Asked if he had any concerns about Lang living in the home given his past history of an OVI, his failure to pay child support for his own child, and eventually his consent to the adoption of his child to her stepfather, Doughty stated he had no concerns as Clark was the legal guardian, not Lang. T. 25-26.

{¶ 29} Doughty testified that in the visitation case, he recommended Grandparents have two uninterrupted and unmonitored phone calls per week and still does. However, he stated Grandparents have reported that these phone calls were either not taking place or were brief, chaotic, and monitored when they did take place. Grandparents also complained they were being prevented from attending medical appointments for the children. However, Clark was not required by any prior court order to permit grandparents to attend medical appointments for the children. Rather, she was to keep Grandparents informed. T. 36, 43.

{¶ 30} In his report prior to trial, Doughty stated he believed it was in the children's best interests to remain with Clark. He had been involved with Clark and the children for three years at that point and found the children were well cared for, supported, protected, and their medical and dental needs are being met. T. 47-48.

{¶ 31} During Doughty and Clark's testimony, counsel for Grandparents introduced documents to show Lang had one child from a previous marriage for whom he failed to pay child support. Between 2015 and 2020, he was found in contempt numerous times for his failure to meet his support obligation and sentenced to jail time on four occasions with purge conditions. His visitation with his child was supervised. In 2015, Lang was charged with OVI and possession of drug paraphernalia and marijuana. In 2020, Lang consented to the adoption of his child by the child's step-father. T. 14-15.

{¶ 32} The trial court also heard testimony from Lang's previous employers. These witnesses indicated Lang was employed by the Newcomerstown Police Department from July 2023 to November 2023. Lang resigned with an investigation of officer misconduct pending. T. 450, Plaintiff's exhibit 12. Lang was then hired by the Carrollton Police Department on December 4, 2023 but terminated on December 21, 2023 when it was discovered he had a pending indictment for felony theft in office as a result of the Newcomerstown investigation. T. 236-238, Plaintiff's Exhibits 5 and 6.

{¶ 33} Grandmother testified she lives in Kentucky with Grandfather in a three-bedroom home. They have been married for 35 years. Grandfather is an insurance broker and grandmother assists him with the clerical aspect of the business. Their home is 3.5 to 4 hours away from Clark's home. Grandparents had three children, two of whom are deceased; the father of I.V. and X.M. from a drug overdose, and a daughter with special needs who passed at 15 years old due to complications of a chromosome abnormality. T. 257-259, 268.

{¶ 34} For the first three years of I.V.'s life, she spent two to three weeks of every month with Grandparents due to Mother and Father's inability to parent. T. 263-264.

{¶ 35} Grandparents testified Clark often interfered with phone calls between Grandparents and Grandchildren. Phone calls were not unmonitored as agreed to in the 2022 visitation agreement. Rather, phone calls were made while the children were riding in the car, while Clark was present in the vicinity cooking and cleaning, with the television loud in the background, or during the children's activities. The calls were also not twice a week as agreed upon. As many as 11 days would pass without Grandparents hearing

from the children. T. 274-278, 531-532. Grandparents also did not get their allotted two weeks of summer visitation in 2023. T. 283-285, 533-534.

{¶ 36} I.V. is special needs and has an IEP. Grandparents received a copy of I.V.'s IEP which stated Clark had advised I.V. was in counseling with Phoenix Rising as recommended by the IEP. Clark advised Grandparents of the same and indicated that when the counselor felt it was appropriate, Grandparents would be included. But when Grandparents contacted the counselor at Phoenix Rising, they discovered I.V. was not in counseling. T. 298-300.

{¶ 37} Grandparents also found Clark dishonest in that when they gave Clark $70 for I.V.'s school pictures Clark cashed the check, but never produced the photos. Grandparents had to contact the photographer directly and pay for the photos again. T. 308-312. Grandparents also wanted to be present for X.M.'s first flag football game, but Clark did not let them know when the game was until after it had taken place. T. 318-32.

{¶ 38} Grandparents were concerned about Lang living with Grandchildren. Grandmother's biggest concerns were that Lang "signed his rights away to his own child," did not pay child support, and had supervised visitation with his child before she was adopted by her stepfather. Grandfather viewed Lang as a "deadbeat person," with emotional problems, PTSD, and access to a gun. T. 285-286, 538, 551. Grandfather was also concerned about Lang showing up at visitation exchange locations and X.M.'s flag football games with a gun on his hip. Grandparents felt this was an attempt to intimidate them. T. 426, 546-547. Lang took care of the children when Clark was at work which concerned grandparents. T. 425. When Grandparents dropped grandchildren off after

visitations, I.V. would cry, have "meltdowns" and cling to Grandparents, yet when picked up, they ran to Grandparents. T. 544.

{¶ 39} Grandparents also had concerns with the overall appearance of the children. They stated the children's clothing was often dirty, smelled of dog, and was poorly fitted. Grandparents purchased clothing for the children, but never saw them wearing the clothing they purchased. T. 540-541.

{¶ 40} Lang testified he moved in with Clark in December of 2022. He acknowledged he and Clark had lived together in 2020 and that he had moved out. He denied, however, that he had moved out because Tuscarawas County Job and Family Services had prohibited him to live in the home with the children. Instead, he stated he had moved out due to pending custody issues with his own child. 455-456. Lang admitted that his visitation with his daughter was supervised visitation but claimed it was due to the amount of time that had passed since they had visitation. T. 457. Lang denied having any mental health diagnosis yet stated he had talked to a counselor about anxiety, depression, and PTSD. T. 457-458. Lang stated that he resigned from Newcomerstown Police Department on November 13, 2023, but he had not told Clark about that until a few days before his January 3, 2024 testimony in this matter. He stated he sold his gun and that he did not believe it was inappropriate to have the gun on his hip at the flag football game because he was a police officer at the time. T. 493-496.

{¶ 41} Clark testified she and Lang had discussed marriage. She was also pursuing adopting I.V. and X.M. She believed that while Lang struggled after leaving the Marine Corps after six years of service, he was still a good father figure, had never been violent, and had never had any issues with children's services. She stated the drug

charges against Lang were dismissed and she had no knowledge of the details of Lang's divorce proceedings. T. 27, 83-84, 661-662.

{¶ 42} Clark denied that Tuscarawas County Job and Family Services had told her Lang had to leave the house. Rather, she stated Lang moved out because he needed to address his divorce and his custody issues with his own daughter and she needed to focus on I.V. and X.M. T. 619. In Lang's absence, Clark's brother helped her with the children when she had to work late shifts at Brewhouse. T. 620. Because X.M. was born drug dependent and experienced severe withdrawal symptoms, Clark stepped away from her schooling to care for him, but was still pursuing a nursing degree. T. 621.

{¶ 43} Since being placed with Clark, I.V. has been participating in physical and occupational therapy. I.V. has a genetic condition that causes low muscle tone. She required braces on her ankles and therapy to assist with coordination. She has improved and graduated from physical therapy but still receives occupational therapy both privately and through her IEP. Both I.V. and X.M. required eye surgery because both had a condition wherein they were unable to keep their eyes straight and focused. T. 623-624. I.V. engaged in counseling with Ohio Guidestone to address her nightmares, night terrors, depression and anxiety. These issues improved. They briefly tried counseling at Phoenix Rising, but I.V. did not engage well with the counselor. T. 626-627.

{¶ 44} As to Grandparents missing a week of summer visitation in 2023, Clark stated there were simply not enough weeks to the summer. She stated the Beyers get four weeks, I.V. was still in occupational therapy the first, third, and fifth Tuesday of each month, X.M. had his eye surgery, and both children were engaged in sports. T. 647-649. Clark also denied missing twice-weekly phone calls. She stated that if the children were

with her, as opposed to on visitation with the Beyers or Grandparents, Grandparents were getting their twice-weekly calls. T. 103. Clark admitted that some but not all calls took place in the car. She explained, however, that Grandparents got upset when calls were short. She therefore tried to have the children make the calls in and environment where they would be the least distracted.

{¶ 45} On direct examination, after Lang's testimony and learning of the Newcomerstown charges against him from her attorney first and not Lang, Clark testified she was overwhelmed. She further stated that if the court were to find Lang unfit for the children to be around, "he will be out before the end of the business day." T. 665-666. She acknowledged Lang lied to her and is "an idiot" but did not feel he presents any threat to the children. T. 685, 697.

{¶ 46} On the issue of the $70 check, Clark stated she did deposit the check, but then simply forgot about the pictures and the entire incident was an oversight on her part. During trial, she gave her attorney $70 cash to give to Grandparents. T. 680-681.

{¶ 47} Doughty was recalled at the end of trial. He stated his best interest opinion had not changed based on what he had heard throughout trial. As to Lang, Doughty stated:

> My thoughts are that he is likely a dishonest person. And certainly, I'm concerned as to the impact that he may have on the, on the children. But I can only speculate as to what that could be. You know looking at his, his past record, you know, he has one incident that led to three charges in 2015, OVI, drug paraphernalia, drug possession.

But he was also, at the same time, going through a divorce. And it was also eight years ago. . . . But you know, theft in office, an allegation of that is a concern. Being fired from two law enforcement agencies is a concern. But, at the same time, those law enforcement agencies hired him, performed adequate, presumably adequate background checks. So, I suppose the answer is mildly concerned with regard to, you know, with regard to the well-being of the children. I can imagine a situation where he could steal from Tosha or the children, or just be dishonest in some way. But there's nothing to really demonstrate a safety concern for the children.

{¶ 48} T. 742-743.

{¶ 49} In its judgment entry, the trial court cited R.C. 3109.04(F)(1) as containing the factors to be considered in determining the best interests of the children. It further found that in applying those factors to the facts of this case, it was the children's best interest to be placed in the legal custody of grandparents. The trial court found Lang's actions and decision making were of great concern in relation to the best interests of the children. The trial court specifically noted Lang's dishonesty as a law enforcement officer, his multiple contempt findings during his daughter's custody case, surrendering parental rights of his own daughter, his dishonesty with Clark, and his overall lack of responsibility. The trial court further found Lang's testimony incredible.

{¶ 50}  Based upon the foregoing, we find the trial court's decision is supported by a preponderance of the evidence, and the trial court did not abuse its discretion in granting legal custody of the children to Grandparents.

{¶ 51} The first and second assignments of error are overruled.

III

{¶ 52} In her final assignment of error, Clark argues the trial court abused its discretion in prohibiting contact between Lang and the children. We find Clark does not have standing to assert this claim.

{¶ 53} The aggrieved party of the no-contact order is Lang. It is well settled "that an appeal lies only on behalf of a party aggrieved by the final order appealed from." *Ohio Contract Carriers Assn., Inc. v. P.U.C.O.*, 140 Ohio St. 160 (1942). Lang never filed a motion to intervene and is therefore not a party to this matter. Clark can neither object or appeal by raising arguments on behalf of Lang. See *Moore v. City of Middletown*, 133 Ohio St.3d 55, 2012-Ohio-3897, 975 N.E.2d 977; *In re Mourey*, 2003-Ohio-1870, ¶ 20. (4th Dist.) ("a party cannot appeal an alleged violation of another party's rights"); In the Matter of K.C., 2016-Ohio-3229 (7th Dist.) ¶ 12; *C.B. v. K.R.*, 2019-Ohio-3621, ¶ 18 (12th Dist.).

{¶ 54} While "[a]n appealing party may complain of an error committed against a nonappealing party when the error is prejudicial to the rights of the appellant," Clark has failed to explain how the no-contact order is prejudicial to her. *In re Smith*, 77 Ohio App.3d 1, 13 (1991); *In re Hiatt* (1993), 86 Ohio App.3d 716, 721 (1993). Indeed, Clark testified that that if the court were to find Lang unfit for the children to be around, "he will be out before the end of the business day." T. 665-666.

{¶ 55} Based on the forgoing, the third assignment of error is overruled.

{¶ 56} The judgment of the Tuscarawas County Court of Common Pleas Juvenile Division is affirmed.

By King, J.,

Hoffman, P.J. and

Wise, J. concur.